UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOUTH SHORE SAVINGS BANK, <br><br> Plaintiff, <br><br> v. <br><br> PACELINE LIMITED PARTNERSHIP, <br> GRANITE STATE ECONOMIC <br> DEVELOPMENT CORPORATION, <br> U.S. SMALL BUSINESS ADMINISTRATION, <br> and CORE INVESTMENTS, INC., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 10-11828-DJC <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                   March 14, 2012

### I.   Introduction

Plaintiff South Shore Savings Bank ("South Shore") brings this Interpleader action to determine the rights and entitlement of the Parties, Paceline Limited Partnership ("Paceline"), Granite State Economic Development Corporation ("Granite State"), the United State Small Business Administration ("the SBA") and Core Investments, Inc. ("Core"), to proceeds (the "Proceeds") generated from South Shore's foreclosure of a first mortgage on real property in Massachusetts owned by Paceline. Core and SBA have submitted cross-motions for summary judgment. For the reasons set forth below, the parties' cross-motions for summary judgment are DENIED without prejudice.

### II.   Factual and Procedural Background

1

The following facts are undisputed. South Shore was the holder of a first mortgage on real property located at 846-858 Main Street and 218 Pine Lane Extension in Osterville, Massachusetts owned by Paceline. (Agreed Statement of Facts ¶ 6). The mortgage secured obligations due on a Commercial Installment Note in the principal amount of $1,190,000.00 made by Paceline in favor of South Shore and dated September 12, 2008. (Id.). Granite State was the holder of a second mortgage on the property for $976,000.00, also dated September 12, 2008. (Id. at ¶ 7). This mortgage was unconditionally guaranteed by the SBA under the "504 Loan" program. (Id.). Consequently, the SBA would stand in the shoes of Granite State upon Paceline's default on the second mortgage. (Id.). As a result of Paceline's defaults under the loan documents, South Shore scheduled a foreclosure sale of the property for July 30, 2010. (Id. at ¶ 8).

Two days before the scheduled foreclosure sale, on July 28, 2010, Core contacted Granite State and offered to purchase Paceline's defaulted $976,000.00 note from Granite State for $250,000.00. (Id. at ¶ 9). Granite State contacted the SBA and received preliminary approval of the sale at $250,000.00. (Id.). Later that same evening, Core notified Granite State that it was reducing the $250,000.00 offer to $75,000.00. (Id.). Also that same day, Paceline filed a voluntary petition under Chapter 7 of Title 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts. (Id. at ¶ 10).

The following day, July 29, 2010, South Shore filed an emergency motion for relief from the stay with the Bankruptcy Court seeking to foreclose on the property. (Id. at ¶ 11). The Bankruptcy Court scheduled a hearing on the motion for August 13, 2010 and further ordered South Shore to cancel the foreclosure sale scheduled for July 30, 2010. (Id.). Also on July 29, 2010, Granite State informed Core that the SBA declined the reduced $75,000.00 offer and would not enter into

additional negotiations. (Id. at ¶ 12). On August 12, 2010, with no objections having been filed, the Bankruptcy Court granted South Shore's motion for relief from the stay. (Id. at ¶ 13). Pursuant to the relief order, South Shore held a foreclosure auction of the property on or about August 26, 2010. (Id. at ¶ 14). The winning bid was for $1,900,000.00. (Id.).

On August 26, 2010, Core contacted Granite State and renewed its previous offer to purchase Paceline's defaulted $976,000.00 note from Granite State for $250,000.00. (Id. at ¶ 15). On or about September 2, 2010, Granite State received preliminary approval from the SBA of the $250,000.00 amount. (Id. at ¶ 16). Granite State contacted Core via telephone and left a voicemail message. (Id. at ¶ 17). The voicemail message stated, in pertinent part:

> Carissa calling from Granite State Development. Its about 4:20 on Thursday the Second. I am calling you in regard to the SBA's decision on the purchase of our Note for Osterville Hardware . . . they have concurred for the $250,000.00 . . . . [G]ive me a call on Tuesday and we can discuss it. I will however just need some forms from you I guess you had sent some assignment forms. I will need those forms as well as for you to wire in the $250,000.00 to the SBA and we can talk about that as well . . . .

Id. About a week later, on September 8, 2010, Core sent the sale and assignment documents to Granite State via email. Id. at ¶ 18. The email addressed to Carissa Murray of Granite State provided, in relevant part:

> The above attachment contains a Sale and Non-Recourse Assignment of Financial Obligations relative to the Paceline Limited Partnership loan. If acceptable, please have the sale and assignment documents executed by the appropriate individual of the SBA and returned to my attention. Upon receipt, we will execute the documents and wire-transfer the full purchase price of $250,000.00. We must also coordinate SBA's delivery of the loan file to Core Investments.

Id. The following day, Granite State and the SBA informed Core that the SBA would not be going forward with the sale of the note. (Id. at ¶ 19). Steven Clark, Loan Specialist at the SBA, e-mailed

3

Murray, copying Richard Kennedy (agent for Core), stating that "the recent August 26, 2010 proposal of $250,000 for the purchase of the SBA note and mortgage came in after the first mortgage lender foreclosure sale was held. SBA will be proceeding with interpleader action against the foreclosing lender. Please do not send the funds to SBA as they cannot be accepted." Kennedy Aff. ¶ 13, Ex.6. At no time did the SBA execute the sale and assignment documents. (Agreed Statement of Facts ¶ 19).

The sale of the property closed on September 30, 2010. (Id. at ¶ 20). The obligation to South Shore was $1,314,410.59, leaving a balance of $585,589.41. (Id.). To close the sale, South Shore was required to provide the successful bidder with a $15,000 closing credit. (Id.). The next highest bidder had bid $25,000.00 less than the successful bidder. (Id.). This Court allowed South Shore's request to reimburse itself for the closing credit cost from the net proceeds of the sale. (Id.). Thus, the remaining proceeds total $570,589.41. (Id.).

On October 27, 2010, South Shore filed an interpleader action to determine the rights of the named parties in the proceeds from the foreclosure sale. (D.1).[1] The SBA and Core subsequently filed cross-motions for summary judgment, each claiming entitlement to the proceeds. (D. 19, 26). The Court heard oral argument on the motions and took them under advisement.

**III.    Discussion**

    **A.    Standard of Review**

---

[1]Although Paceline and Granite State were properly served with the Interpleader complaint, neither party has filed an Answer or otherwise appeared in this matter claiming an interest in the Proceeds. (Agreed Statement of Facts ¶ 24). Counsel to the Chapter 7 Trustee of Paceline informed counsel of South Shore that the Chapter 7 estate of Paceline has no interest in pursuing this matter or seeking any of the proceeds. (Id. at ¶ 25).

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56 (a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Here, as evidenced by the cross-motions for summary judgment, the parties assert that there are no disputed issues of material fact and urge the Court to proceed to determine which party is entitled to summary judgment as a matter of law. See FED. R. CIV. P. 65(a); Comm. of Mass., by Dep't of Public Welfare v. Yeutter, 756 F. Supp. 48, 49 n. 1 (D. Mass. 1991).

### B. Whether SBA and Core Reached an Enforceable Agreement For Purchase of the Note

The requisite elements of a contract are an offer, acceptance, and an exchange of consideration or meeting of the minds. Vadnais v. NSK Steering Sys. Am., Inc., 675 F. Supp. 2d 205, 207 (D. Mass. 2009). The SBA does not dispute that Core made an offer to purchase the Note from the SBA, but argues that the remaining elements of an enforceable agreement cannot be established as a matter of law.

"It is well settled that an agreement need not be in writing in order to be enforceable." ESO, Inc. v. Kasparian, 32 Mass. App. Ct. 731, 733-34 (1992). "Where . . . parties negotiate orally as to the terms of an agreement while intending to execute a written contract, the parties generally are not bound until the contract is signed." Novel Iron Works, Inc. v. Wexler Const. Co., Inc., 26 Mass. App. Ct. 401, 407- 408. "If, however, the parties orally agree to the essential terms of the transaction, it may be inferred that they intended to bind themselves at that time and that the 'writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms.'" Id. at 408 (quoting Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935)). "Further, where the facts show that the parties intended to be

bound at some point in their negotiations before execution of a formal contract, they will not be bound unless there is agreement as to the basic terms of the undertaking." Novel Iron Works, 26 Mass. App. Ct. at 408. Thus, to be enforceable "[t]here must be an agreement on the essential terms of the transaction in order [for] the nature and extent of the parties' obligations [to] be determined and, hence, enforced." Id.

Applying these principles, Core argues that a valid, enforceable agreement existed between Core and Granite State/the SBA whereby the SBA agreed to sell the Note to Core. Core contends that it renewed its original offer to Granite State to purchase the Note for $250,000 on August 26, 2010, see Agreed Statement of Facts ¶ 15, (which Core alleges is the "offer") and that Granite State "accepted" that offer when, on September 2, 2010, Carissa Murray of Granite State left a voicemail message for Richard Kennedy of Core indicating that she was calling regarding "SBA's decision on the purchase of our Note for Osterville Hardware" and stating that "[SBA] ha[s] concurred for the $250,000.00," Agreed Statement of Facts ¶17. See Core Mem. at 7-8. Core contends that the parties had reached an agreement regarding the material terms and that Murray's further statement in the September 2nd message – informing Kennedy that they could discuss the matter the following Tuesday and stating that she "will however just need some forms from you I guess you had sent some assignment forms. I will need those forms as well for you to wire in the $250,000 to the SBA and we can talk about that as well . . . ," Agreed Statement of Facts ¶ 17 – and the further communications between the parties,[2] concerned only the ministerial task of executing the parties'

---

[2] After Murray of Granite informed Kennedy of Core that the SBA had concurred with the sale price of $250,000.00, there were further communications. On September 7, 2010, Kennedy e-mailed Murray, informing her that he "would like to move forward with your approved sale of the Osterville second mortgage for $250,000.00. I have your wire instructions and by copy of this e-mail to our attorney . . . I'm asking that he prepare the necessary assignment documents.

agreement. See Core Mem. at 7-11.

The SBA argues that there is no enforceable contract since it did not accept Core's offer to purchase the note; rather, its acceptance was contingent upon the review and approval of the sale and assignment documents by those with the necessary authority at the SBA to bind it to the transaction.[3] In support of this argument, the SBA contends that when Kennedy of Core asked that the "sale and assignment documents to be executed by the appropriate individual of the SBA" on September 8, 2010, this meant that Core was aware that the SBA could not be bound to the agreement until it executed the sale and assignment documents. (SBA Mem. at 5).

The SBA also makes much of the language in Kennedy's September 8, 2010 e-mail attaching a Sale and Non-Recourse Assignment of Financial Obligations, stating that "[i]f acceptable, please have the sale and assignment documents executed by the appropriate individual of the SBA and returned to my attention. Upon receipt, we will execute the documents and wire-transfer the full purchase price of $250,000.00." Kennedy Aff. ¶ 8, Ex. 3. The SBA argues that by using the phrase,

---

We should probably also prepare a Loan Sale agreement." (Kennedy Aff. ¶ 7, Ex. 2). Also on September 7, 2010, Murray e-mailed Clark of SBA, copying Kennedy, asking what documents the SBA would need to "complete" the transaction with Core. (Kennedy Aff. ¶ 6, Ex. 1). Later that day, Murray e-mailed Kennedy and asked that Core prepare "assignment for the mortgage, note, guaranties, etc." (Kennedy Aff. ¶ 7, Ex. 2). The next day, September 8, 2010, Kennedy emailed a "Sale and Non-Recourse Assignment of Financial Obligations" regarding the Note and stated that "[i]f acceptable, please have the sale and assignment documents executed by the appropriate individual of the SBA and returned to my attention. Upon receipt we will execute the documents and wire-transfer the full purchase price of $250,000.00. We must also coordinate SBA's delivery of the loan file to Core Investments." (Kennedy Aff. ¶ 8, Ex. 3).

[3]The SBA also contends that there is no enforceable contract because the Statute of Frauds, Mass. Gen. L. C. 259, § 1, demands that a contract to convey land requires a written agreement. (SBA Mem. at 3). In light of the Court's direction to the parties for additional filing and briefing on another issue, see discussion at 10, *supra*, the Court has not addressed this argument, but notes that the issue has already been fully briefed by the parties.

"if acceptable," Core understood that SBA's acceptance was not binding without the review and approval of the sale assignment documents. (SBA Mem. at 5).

"Under Massachusetts law, when parties have agreed to execute a final written agreement, there is a strong inference that the transaction is still open and that the parties are not bound until such a written agreement is produced." Aegis v. Finnegan, 2002 WL 225924, at *2 (D. Mass. Feb. 12, 2002) (internal quotation marks and citation omitted). "If, however, the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract." Goren v. Royal Invs. Inc., 25 Mass. App. Ct. 137, 140 (1987); Rosenfield, 290 Mass. at 216; Aegis, 2002 WL 225924, at *2 (noting that "[a]n unwritten binding contract may exist when there is enough evidence of an oral agreement to infer that a contract existed, and that a final written document was largely an outstanding formality"). It is undisputed that the parties contemplated a final written memorialization of their agreement, but the parties disagree about the meaning of that writing: the SBA contends that this indicates that the parties had not yet reached any enforceable agreement and Core contends that the final memorialization was the ministerial paperwork to formalize their otherwise enforceable agreement. Neither party, however, has addressed all of the factors bearing on whether a contract has been formed where a final agreement has yet to be memorialized, namely:

> the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

Aegis, 2002 WL 225924, at *2 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. c (1979)). Courts have applied these or similar factors in determining whether the parties intended to be bound to an agreement absent the final writing such as the parties' negotiations, conduct, draft agreements and final written agreements. See, e.g., Salem Laundry Co. v. New Eng. Teamsters and Trucking Indus. Pension Fund, 829 F.2d 278, 281 (1st Cir. 1987) (determining that the parties' conduct during the negotiation of a complex deal did not support an inference that the parties intended to be bound until a formal document was executed); Novel Iron Works, 26 Mass. App. Ct. at 408, 410 (concluding that the parties intended to and did enter into a binding agreement in light of the "statements of the parties on that date, the very magnitude of the undertaking, the parties' correspondence subsequent to [the date upon which the agreement was made], and the two drafts of the contract" and noting that the essential terms of the agreement had been reached, and the parties acted in accordance with their agreement). Compare Goren, 25 Mass.App.Ct. at 141 (holding the execution of the contract was a mere formality where all significant issues were settled in the preliminary agreement) with Aegis, 2002 WL 225924, at *2-3 (finding that the parties' negotiations and draft agreements indicated that the parties had not agreed on certain material terms and that no meeting of the minds occurred to form an enforceable agreement); Held v. Zamparelli, 13 Mass. App. Ct. 957, 958 (1982) (holding unenforceable an oral agreement due to lack of essential terms) and George W. Wilcox, Inc. v. Shell E. Petroleum Products, Inc., 283 Mass. 383, 390 (1933) (finding no enforceable contract shown where many of the essential terms were omitted)).

As to the factors enumerated under Aegis, although the undisputed facts indicate that the contract was for a large amount of money ($250,000) and the SBA does not dispute that Core took steps to perform under the contract (i.e., sending funds to its attorney for later transmittal to the

SBA), the parties do not address whether there were other material terms of the contract (other than the purchase price and method of transmittal of funds) contemplated by the parties, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether the final contract documents - i.e., those referenced in the September 7, 2010 e-mail or those transmitted from Kennedy to Murray on September 8, 2010 (which have not been produced to the Court)[4] - have few or many details, whether the parties considered the contract to be a common or unusual contract and whether, based upon the experience of the parties, it was a standard form of contract widely used in similar transactions. Although no single factor is determinative, the Court believes that it should have the parties' relative positions on these factors. Moreover, although the current record before the Court is silent as these factors, it may well be that they are facts that are undisputed by the parties. Accordingly, the Court will deny the pending motions for summary judgment without prejudice, but will give the parties until April 13, 2012 to submit any supplemental statement of undisputed facts to address these factors and each party may file a supplemental brief of no more than five [5] pages to address any arguments regarding these factors. Upon review of these filings, the Court will reopen and reconsider the motions for summary judgment motions in light of the supplemental submissions.

**IV.     Conclusion**

For the foregoing reasons, the parties' cross-motions for summary judgment are DENIED

---

[4]The Court notes that Core produced the September 7, 2010 e-mail and the September 8, 2010 e-mail as Exhibits 2 and 3, respectively, to the Kennedy Affidavit, but the Loan Sale Agreement referenced in the September 7th e-mail and the Sale and Non-Recourse Assignment of Financial Obligations documents attached to the September 8th e-mail were not attached to either of the exhibits filed with the Court. "How [a] document is written can determine whether it was meant as a written memorialization of an earlier contract, or an agreement enforceable only upon execution." Salem Laundry Co., 829 F.2d at 281.

without prejudice. As directed above, the parties have until April 13, 2012 to submit a supplemental statement of undisputed facts and supplemental briefing (not to exceed five pages by either party) addressing the factors discussed above.

**So ordered.**

/s/ Denise J. Casper
United States District Judge